SEALED

CLERK US DISTRICT COURT
NORTHERN DIST OF TX
FILED

2017 FEB 14  AM 9:21

DEPUTY CLERK_____

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | Civil Action No.: |
| | ) | |
| PATRICK O. HOWARD; | ) | **3-17CV-420-L** |
| HOWARD CAPITAL HOLDINGS, LLC; | ) | FILED UNDER SEAL |
| AND OPTIMAL ECONOMICS CAPITAL | ) | |
| PARTNERS, LLC, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## COMPLAINT

For its complaint against Defendants Patrick O. Howard, Howard Capital Holdings, LLC ("Howard Capital"), and Optimal Economics Capital Partners, LLC ("OE Capital"), Plaintiff Securities and Exchange Commission ("SEC" or "Commission") alleges as follows:

**Summary**

1.      Since February 2015, Howard Capital and OE Capital—companies owned and controlled by Howard—have raised more than $13 million by selling securities in the form of membership units ("Units") in three Texas limited liability companies:  (1) Insured Liquidity Partners CFG I, LLC ("CFG I"), (2) Insured Liquidity Partners CFG II, LLC ("CFG II"), and (3) OE Capital Ventures, LLC ("OE Fund") (collectively, the "Funds").  Howard operated each company as an investment fund.  He offered and sold Units in the funds personally and through sales agents he employed at OE Capital.  He also retained two other firms—C4 Benefits Group, Inc. ("C4 Benefits"), and Trajan Income, Inc. ("Trajan Income")—paying them a 5% commission to sell the Units.

2.      Howard has pursued an aggressive solicitation effort to sell the Units.  He used offering proceeds to fund a radio-advertising campaign to attract investors.  The advertisements, along with numerous written offering materials, contained representations that investors would earn a 12% annual return at a minimum.  The Funds purportedly generated this return over a three-year investment period by investing in third-party portfolio companies in exchange of a share of the companies' revenue.  Howard Capital, OE Capital, Howard, C4 Benefits, and Trajan Income and sales agents they employed have offered and sold the Units in investment seminars, in personal meetings, and by telephone and email.

3.      In reality, the Defendants have perpetrated an egregious fraud on the Funds' investors.  They have misappropriated and misapplied offering proceeds.  They have issued investors phony account statements showing returns, which in fact did not exist.  And they have disseminated written offering materials containing numerous untrue and misleading statements as to material facts, including the following:

- That investors would receive a minimum return of 12%, paid quarterly.  In reality, quarterly cash payments to investors were mostly Ponzi payments—taken from other investors' contributions.

- That the Funds achieved average growth of 20%.  In reality, the Funds have earned just $33,334 since inception, a growth rate of only 0.25%.

- That, for CFG II, "the Company is backing the minimum preferred yield and principal with insurance based assets."  In reality, CFG II never purchased any such insurance-based assets.

- That OE Fund would pay no sales commissions.  In reality, OE Fund paid at least $175,000 in sales commissions.

- That Howard was a Registered Investment Adviser ("RIA").  In reality Howard was never an RIA.

4.      The Defendants' misappropriation and misapplication of offering proceeds began shortly after the first fund's inception in early 2015.  For example, CFG I's private-placement

2

memorandum ("PPM") represented that it would invest 89% of the offering proceeds in third-party companies.  In reality, CFG I raised $833,993, but it invested only $50,000 in one portfolio company.  Howard used the remaining proceeds to pay himself and expenses unrelated to CFG I's stated objectives.

5.      Of the approximately $12.26 million raised in the CFG II and OE Fund offerings, combined, Howard invested only approximately $7.4 million in portfolio companies as promised.  While the PPMs for these funds represented that they would use a minimum of 75% of the offering proceeds for portfolio-company investment, the $7.4 million invested represented just 60% of the total proceeds raised in these funds, far below the promised minimum.  Moreover, in addition to paying himself salary and bonus, Howard transferred $226,000 to his personal bank account and paid an additional $197,000 to buy out a former business partner in CFG I.  Finally, Howard used at least $146,000 of the offering proceeds from the CFG II and OE Fund Investment programs to pay so-called returns to investors.  In reality, these were Ponzi payments.

6.      Howard and his companies continue to offer and sell the Units at present.  But CFG I, CFG II, and OE Fund are each financially incapable of meeting their obligation to pay even the minimum return owed as of December 31, 2016, within the three-year investment period.

7.      By reason of the foregoing, Howard, Howard Capital, and OE Capital violated and are continuing to violate Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78o(a)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

8.      In the interest of protecting the public from further violations by the Defendants, the SEC seeks, among other things, permanent injunctions, disgorgement plus prejudgment interest, and civil money penalties from each Defendant.

**Jurisdiction and Venue**

9.      The SEC brings this action under Securities Act Section 20(b) [15 U.S.C. § 77t(b)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], seeking to restrain and enjoin the Defendants permanently from engaging in such acts and practices as alleged herein.

10.     This Court has jurisdiction over this action under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Sections 21(e) and 27 [15 U.S.C. §§ 78u(e) and 78aa].  Each of the Units offered and sold as described in this complaint is an investment contract and, therefore, a "security" as that term is defined under Securities Act Section 2(a)(1) [15 U.S. C. § 77b(a)(1)] and Exchange Act Section 3(a)(10) [5 U.S. C. § 78c(a)(10)].

11.     The Defendants, directly and indirectly, made use of the mails or of the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business described in this complaint.

12.     Venue is proper because transactions, acts, practices, and courses of business described in this complaint occurred within the Northern District of Texas.

**Parties**

13.     Plaintiff SEC is an agency of the United States of America charged with enforcing the federal securities laws.

14.     Defendant Howard, an individual aged 46, resides in Dallas, Texas.

15.     Defendant Howard Capital is a Texas limited liability company, owned by Howard, with its principal place of business in Dallas, Texas.

16.     Defendant OE Capital is a Texas limited liability company, owned by Howard, with its principal place of business in Dallas, Texas.

## STATEMENT OF FACTS

### Howard Operated the Funds through Howard Capital and OE Capital

17.     Since March 2015, Howard Capital and OE Capital have raised more than $13 million by selling securities in three Texas limited liability companies: CFG I, CFG II, and OE Fund. Howard operated each of the three companies as an investment fund. Investors had no control over the management of the Funds. They looked to Howard and his companies' management to bring about fund success. And their sole contribution to the Funds was that of money.

18.     For each fund, the table below sets out the offering period, investor count, and the specific amount raised:

| Fund | Offering Period | Investors | Amount Raised |
|------|-----------------|-----------|---------------|
| CFG I | March 2015 – January 2016 | 18 | $   833,993 |
| CFG II | August 2015 – February 2016 | 36 | $ 4,297,398 |
| OE Fund | February 2016 – December 2016 | 65 | $ 7,960,585 |
| **Total:** | | **119** | **$13,091,976** |

19.     Howard managed the Funds personally and through Howard Capital and OE Capital. Howard exercised ultimate authority over Howard Capital, OE Capital, and each of the Funds, including their bank accounts, overall direction, the content of their public statements, and the decision to disseminate such statements.

20.     Howard solicited investors in person and by telephone to raise the money for CFG I. For CFG II and OE Fund, he retained C4 Benefits and Trajan Income to raise money by soliciting investors. These companies raised money for those two Funds through May 2016, in exchange for a 5% sales commission and other payments derived from the offering proceeds.

5

Howard and sales agents he employed at OE Capital have also offered OE Fund Units for sale in investor seminars and by email.

**Written Offering Material**

21.     In soliciting investors for each of the Funds, Howard distributed a partnership agreement and private-placement memorandum ("PPM"), describing the Fund, its management, and its investment objectives.  Howard personally distributed the CFG I PPM and partnership agreement to investors.  For the CFG II and OE Fund, he provided PPMs and partnership agreements to C4 Benefits, Trajan Income, and other sales agents to disseminate to investors.  He also provided C4 Benefits, Trajan Income, and other sales agents a packet of OE Capital marketing documents (the "Investor Packet"), which he updated from time to time, for use in soliciting investors to purchase Fund Units.  See Ex. 28 and 53.  OE Capital employees also disseminated the Investor Packet to investors.

22.     Although the language varied somewhat among the three PPMs, each one provided that the fund would raise money by selling securities in the form of "membership units" ("Units") in the fund for $50,000 apiece.  Each PPM provided that the investment had a three-year term and specified the amount the fund sought to raise.  This amount was $1 million for CFG I and $10 million for CFG II and OE Fund.

**The Funds' Investment Objectives**

23.     Each PPM provided that the fund would use proceeds from Unit sales to make investments in third-party companies.  The CFG I PPM specified that the fund would use the offering proceeds "to purchase royalty revenue interest from CFG Inc. and its affiliates and associates."  The CFG II and OE Fund PPMs provided that those funds would use the offering proceeds to invest in unspecified third-party companies—referred to as "portfolio companies"—

in exchange for a right to receive a portion of the companies' future revenue. A CFG I partnership agreement and the PPMs for CFG II and OE Fund explained that the Funds stood to profit as the portfolio companies paid the revenue interests that the funds were entitled to receive.

24.     In exchange for Units, investors paid their investment dollars over to the Defendants, who pooled those investments into a fund. Collectively, investor fortunes were dependent on the efforts and expertise of the Defendants. And the inventors' role in the Funds was entirely passive, limited to contributing money and expecting profits based upon the Defendants' efforts. Therefore, the Units were securities, specifically investment contracts.

25.     Diagram A below, from the OE Fund PPM, depicts OE Fund's "Flow of Funds," showing that investors would purportedly earn investment returns as the portfolio companies paid revenue into the fund. Although the diagram below relates specifically to the OE Fund, it accurately illustrates the general investment structure common to all three Funds.

*Diagram A*



**Promised Minimum Returns of 12% Annually**

26.     In each fund, Defendants represented to investors that they would earn a minimum return of 12% annually, paid quarterly.  For the CFG I offering, Howard made this representation in telephone calls to investors and in a CFG I partnership agreement that he distributed to investors.  PH Tr. at 78, 291; and see slides mentioned at 433.  For CFG II and OE Fund, he made this representation in their respective PPMs and in the Investor Packet.

27.     Defendants also financed a financed a radio-advertising campaign lasting approximately nine months on stations in Tampa, Florida, where C4 Benefits had an office.

These advertisements, which Howard reviewed and approved, likewise contained representations that investors would earn a 12% annual return at a minimum.

**Misuse of the Offering Proceeds**

28.     Through Howard Capital and OE Capital, Howard knowingly, or with severe recklessness, used the proceeds from Unit sales in each of the Funds contrary to representations in the Investor Packet, the PPMs, and the partnership agreements.

*Misappropriation of the CFG I Offering Proceeds*

29.     Howard misappropriated and misapplied all of the $833,993 raised in the CFG I offering.  According to the CFG I PPM, the Fund intended to devote 89% of the offering proceeds to investments in portfolio companies and just 9% to marketing and corporate expenses.  In reality, however, Howard directed approximately $290,000 (34% of the proceeds) into Howard Capital's bank account.  He directed approximately $474,000 (57% of the proceeds) to his former business partner's company, which temporarily served as a managing member of CFG I.  And he paid $50,000—just 5.9% of the offering proceeds—for a revenue interest in a single company.  Contrary to the CFG I PPM, however, this company was not associated with CFG Inc.  Howard spent the remainder of the CFG I offering proceeds on, among other things, office rent and payroll.  CFG I earned nothing from the $50,000 portfolio-company investment.

*Misappropriation and Misapplication of the CFG II and OE Fund Offering Proceeds*

30.     Of the approximately $12.26 million raised in the CFG II and OE Fund offerings, combined, Howard only invested approximately $7.4 million in portfolio companies.  This represents just 60% of the total proceeds raised in these two funds, far below the minimum 75% represented in their PPMs.  In addition, the CFG II PPM and OE Fund PPM limited spending for corporate expenses to 18% and 20% of the offering proceeds, respectively.  Howard exceeded

these spending limits in both funds.  Moreover, in addition to paying himself salary and bonus, Howard transferred $226,000 to his personal bank account and paid an additional $197,000 to buy out a former business partner who was temporarily associated with CFG I.

31.     The CFG II PPM provided that the fund would use at least 2% of the offering proceeds to purchase "whole life insurance contracts on the principals" of the portfolio companies.  But Howard exhausted all CFG II offering proceeds without applying any funds to purchase the promised insurance policies.

*Ponzi Payments*

32.     Howard used CFG II and OE Fund offering proceeds to make Ponzi payments. As of December 31, 2016, these two funds had collectively received only $33,334 in revenues from the approximately $7.4 million they had invested in portfolio companies—a return on the investors' capital of just 0.25%.  Through the same date, however, Howard paid investors in the three Funds combined a total of $169,000, purporting to be quarterly earnings distributions.  Of the $169,000 distributed, $146,000 constituted Ponzi payments:  The CFG I investors received money invested by CFG II and OE Fund investors.  The CFG II investors received money invested by later CFG II investors and OE Fund investors.  And the OE Fund investors received money invested by later OE Fund investors.

*Inability to Meet Financial Obligation to Investors*

33.     As of December 31, 2016, the Funds were collectively obligated to pay returns to investors totaling more than $1 million, based on the minimum return of 12% per year.  Under the Funds' combined earnings rate of 0.25% from inception through December 31, 2016, the Funds were financially incapable of satisfying this $1 million obligation—whether in cash or in reinvested dividends—within the three-year investment period.  In fact, under the 0.25%

earnings rate, it would take the Funds approximately 30 years just to pay the $1 million owed to investors as of December 31, 2016.

34.     Because he controlled Howard Capital, OE Capital, and the Funds, including their bank accounts, Howard knew, or was severely reckless in not knowing, that the Funds' combined earnings were insufficient to pay investors a 12% annual return within the three-year investment period, that offering proceeds were misappropriated and misapplied, and that offering proceeds were used to make Ponzi payments.

## Untrue and Misleading Statements

### 12% Minimum Returns

35.     Throughout the fund offerings, Howard represented to investors that they would receive minimum returns of 12% annually for three years.  This representation was misleading because it omitted to disclose that the Funds' actual earnings—0.25%—were insufficient to pay the returns as represented.

### Phony Account Statements

36.     Through OE Capital, Howard sent investors account statements containing untrue descriptions of the status of their investments.  For each investor who elected to reinvest quarterly distributions, the statement showed that the investor's account had been credited with the minimum return.  These account statements were false.  In reality, as mentioned above, the Funds generated only $33,334 in earnings as of December 31, 2016, while the total reinvested earnings was nearly $1 million.  Therefore, no money was actually reinvested as represented.

37.     For those investors who received distribution payments, the statements described these payments as a "Preferred Return" or "Yield Earned."  But the so-called Preferred Return or Yield Earned was actually derived from payments made by other investors to purchase Units.

Thus, the payments were Ponzi payments, not payments of earnings. The account statements were false because they labeled Ponzi payments as a return or yield.

### Registered Investment Adviser ("RIA")

38.     The Investor Packet contained brief biographical information about Howard, describing him as follows: "Patrick Howard . . . CEO, Optimal Economics, RIA." This statement was untrue. Howard has never been an RIA, registered either with the SEC or with any state.

### Commission and Salary Payments

39.     On March 29, 2016, Howard signed filed a Notice of Exempt Offering of Securities on Form D, which was filed on OE Fund's behalf with the SEC on the same date. In the Form D, Howard stated that no sales commissions would be paid and that no amounts would be paid to executive officers. From OE Fund, however, Howard paid at least $175,000 in sales commissions. He also transferred over $2 million from OE Fund to OE Capital, from which he personally received salary and other payments.

### OE Capital Average Growth

40.     OE Capital represented to investors that the Funds' minimum annual return was 12%, but that they were actually earning 20% on average. The Investor Packet, reviewed and approved by Howard, contained a chart comparing the Funds to other investment vehicles such as 401Ks, money market funds, and IRAs, among others. A copy of the chart, below, shows OE Capital earning an average 20% growth compared to a 1-8% average growth for the other investment vehicles. In reality, OE Capital based the 20% return on forecast modeling, but failed to disclose that it was a forecast, not a reflection of actual results. In reality, the 20% return forecast was false. It had no reasonable basis, as demonstrated by the Funds' actual rate growth

rate—0.25%.

### Acceptable Investment Accounts

| Account Type | Avg. Growth | Taxes Applied Upon Withdrawal | Early Withdrawal Fees | Option for Income | Liquid |
|---|---|---|---|---|---|
| Money Markets | 3% | Income Tax | No | Yes | Yes |
| 401K | 5% | Income Tax | Yes | No | No |
| IRA | 6-8% | Income Tax | Yes | No | No |
| Fixed Annuity | 2-3% | Income Tax | Yes | No | No |
| 403B | 4-5% | Income Tax | Yes | No | No |
| Savings | 1.00% | None | No | Yes | Yes |
| Mutual Funds * Non-Qualified | 6-8% | Capital Gains Tax | No | Yes | Yes |
| CDs | 1.00% | Income Tax Capital Gains | Yes | No | No |
| Real Estate | 3-4% | Tax | No | Yes | No |
| OECP Benefits | 20% | Capital Gains Tax | No | Yes | Quarterly Distribution 12% preferred yield & share in waterfall 80/20 annually up to 20%, or reinvest for compound principle after 3 yrs. |

*Insurance-Based Assets*

41.      Howard made misleading statements about insurance to give the appearance that the Unit investment was safe.  The CFG I partnership contract referred to the offering proceeds as "insured liquidity."  The OE Fund PPM contained a statement that the fund depended on "insurance based assets purchased to offset company underperformance."  In the CFG II PPM and the Investor Packet, Howard expressly emphasized the importance of insurance-based assets in mitigating the risk of an otherwise speculative investment, stating:

> The purchase of Units is a speculative investment.  However, the Company is backing the minimum preferred yield and principal with insurance based assets. While this should not be considered a guarantee, the company separates the risk of the underlying assets, from the return of the investor.  Therefore, there is assurance of the return of principal and minimum yield distribution.

42.      In reality, insurance provided no assurance of the return of principal and minimum yield distribution, and the statements regarding insured liquidity and insurance-based assets were untrue.  They simply referred to Howard's idea to purchase life insurance covering

13

the portfolio companies' key officers. Not until December 28, 2016, however, did any such insurance policy exist. On that date, OE Capital purchased a life-insurance policy on a single portfolio-company officer. From the first fund's inception through December 27, 2016, the promised minimum return was never insured or otherwise backed with insurance-based assets, nor did the Funds "backstop portfolio underperformance" with such assets.

43.     Moreover, insuring the life of a portfolio-company officer would provide no protection against risk caused by factors other than officer death, such as competition, undercapitalization, officer incompetence, or mismanagement. The claim that insurance-based assets provided assurance of principal and yield was therefore misleading.

### Real Estate

44.     In a section titled "Risk Mitigation," the OE Fund PPM stated that "OE Capital Partners does not solely depend on insurance based assets as a backstop to portfolio underperformance. Other assets classes such as real estate and inventory holdings back the capital injections into portfolio companies." In addition, the Investor Packet contained a pie chart including real estate as a slice of the portfolio-asset management strategy. Under the pie chart, it said, "[o]ur portfolio investment strategy distributes investment funds into portfolio companies, insured liquidity assets and stop loss real estate to achieve a dynamic approach for growth." These statements were untrue. In reality, neither OE Capital nor the Funds ever purchased any real estate.

### Signed Contracts

45.     In March 2016, OE Capital provided existing and prospective investors an Annual Report for 2015. In an executive-summary section, the Annual Report, stated, "This financial report is done in conjunction with" a specified certified public accounting firm. In a section

discussing "Risk Coverage," it stated, "Risk is relatively low when comparing Total Capital Acquired ($4,371,859) to Total Asset Based Valuation ($7,590,604)," parentheses in original. Among OE Capital's total assets, the Annual Report included "signed contracts" purportedly valued at $6,348,200.

46.     The Annual Report was misleading.  The $6,348,200 signed-contract value was assigned by Howard, not by the certified public accounting firm or by any independent appraisal of the contracts.  The Annual Report omitted to disclose that Howard assigned the contract value. By omitting this disclosure while stating that the Annual Report was made "in conjunction with" the certified public accounting firm, the Annual Report conveyed the misleading impression that the certified public accounting firm agreed with the valuation.

**Materiality**

47.     A reasonable investor would have considered the actual use of the Funds' proceeds and their actual earnings rate important—that is, material—in making an investment decision about the Funds.  Likewise a reasonable investor would have considered the statements described above as untrue, false, or misleading important in making an investment decision about the Funds.

**Scienter**

48.     When engaged in the conduct described above and when making the statements described above as untrue, false, or misleading, Howard possessed *scienter*, a mental state embracing intent to deceive, manipulate, or defraud.

**FIRST CLAIM**
**Fraud**
**Violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)] against**
**Howard, Howard Capital, and OE Capital**

49.     Plaintiff Commission re-alleges and incorporates paragraphs 1 through 48 of this

15

Complaint by reference as if set forth verbatim in this Claim.

50.     Defendants Howard, Howard Capital, and OE Capital directly or indirectly, singly or in concert with others, in the offer or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails have:  (a) employed devices, schemes, and artifices to defraud;  (b) obtained money or property by means of untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, and courses of business which operate or would operate as a fraud and deceit upon the purchasers.

51.     With respect to violations of Securities Act Section 17(a)(1), Defendants Howard, Howard Capital, and OE Capital engaged in the foregoing conduct and made the foregoing untrue and misleading statements knowingly or with severe recklessness.

52.     With respect to violations of Securities Act Sections 17(a)(2), Defendants Howard, Howard Capital, and OE Capital knew or should have known that they obtained money or property by means of untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

53.     With respect to violations of Securities Act Sections 17(a)(3), Defendants Howard, Howard Capital, and OE Capital knew or should have known that they engaged in transactions, practices, and courses of business which operate or would operate as a fraud and deceit upon the purchasers.

54.     For these reasons, Defendants Howard, Howard Capital, and OE Capital have violated and, unless enjoined, will continue to violate Securities Act Section 17(a) [15 U.S.C. §

77q(a)].

## SECOND CLAIM
### Fraud
### Violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)]  and
### Rule 10b-5[17 C.F.R. § 240.10b-5] against Howard, Howard Capital, and OE Capital

55.    Plaintiff Commission re-alleges and incorporates paragraphs 1 through 48 of this Complaint by reference as if set forth verbatim in this Claim.

56.    Defendants Howard, Howard Capital, and OE Capital, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails have:  (a) employed devices, schemes, and artifices to defraud;  (b) made untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and courses of business which operate or would operate as a fraud and deceit upon purchasers, prospective purchasers, and any other persons.

57.    Defendants Howard, Howard Capital, and OE Capital engaged in the above-referenced conduct and made the above-referenced untrue and misleading statements knowingly or with severe recklessness.

58.    For these reasons, Defendants Howard, Howard Capital, and OE Capital violated and, unless enjoined, will continue to violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## THIRD CLAIM
### Securities Registration
### Violations of Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e (c)]
### against Defendants Howard, Howard Capital, and OE Capital

59.    Plaintiff Commission re-alleges and incorporates paragraphs 1 through 48 of this

Complaint by reference as if set forth verbatim in this Claim.

60.    Defendants Howard, Howard Capital, and OE Capital, directly or indirectly, singly or in concert with others, have offered to sell, sold, and delivered after sale, certain securities and have (a) made use of the means and instruments of transportation and communication in interstate commerce and of the mails to sell securities, through the use of email, interstate carrier, brokerage transactions, and otherwise; (b) carried and caused to be carried through the mails and in interstate commerce by the means and instruments of transportation such securities for the purpose of sale and for delivery after sale; and (c) made use of the means or instruments of transportation and communication in interstate commerce and of the mails to offer to sell such securities.

61.    By reason of the foregoing, Defendants Howard, Howard Capital, and OE Capital, have violated, and unless enjoined will continue to violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e (c)].

## RELIEF REQUESTED

Plaintiff SEC respectfully requests that this Court:

1.    Permanently enjoin Defendants Howard, Howard Capital, OE Capital from violating Securities Act Sections 5(a), 5(c), and 17(a) [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5];

2.    Order each Defendant to disgorge:

    a.   the amount equal to the funds and benefits obtained illegally by the Defendant, or

    b.   the amount which the Defendant is otherwise found jointly and severally

liable to disgorge,

as a result of the violations alleged, plus prejudgment interest on that amount;

      3.      Order each Defendant to pay a civil money penalty in an amount determined

appropriate by the Court under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange

Act Section 21(d) [15 U.S.C. § 78u(d)] for the violations alleged herein; and

      4.      Order such other relief as this Court may deem just and proper.

DATED: February 14, 2017              Respectfully submitted,

Timothy S. McCole
Mississippi Bar No. 10628
B. DAVID FRASER
Texas Bar No. 24012654
SCOTT MASCIANICA
Texas Bar No. 24072222
United States Securities and Exchange Commission
Fort Worth Regional Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
Phone: 817-978-6453
Fax: 917-978-4927
mccolet@sec.gov

ATTORNEYS FOR PLAINTIFF

JS 44  (Rev. 08/16) - TXND (Rev. 12/16)

# CIVIL COVER SHEET

*SEALED*

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Securities and Exchange Commission

## DEFENDANTS

Patrick O. Howard, Howard Capital Holdings, LLC, and Optimal Economics Capital Partners, LLC

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant **Dallas**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Timothy S. McCole, SEC, 817-978-6453
801 Cherry St., Suite 1900, Fort Worth, TX 76102

Attorneys *(If Known)*

*RECEIVED*
*FEB 1 4 2017*
*CLERK, U.S. DISTRICT COURT*
*NORTHERN DISTRICT OF TEXAS*

3-17CV-420-L

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government
Plaintiff

☐ 2  U.S. Government
Defendant

☐ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Securities Act Sections 5(a), 5(c), and 17(a) [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Exchange Act Sections
Brief description of cause:
10(b) and 15(a) [15 U.S.C. §§ 78j(b) and § 78o(a)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____

DOCKET NUMBER _____

DATE
02/14/2017

SIGNATURE OF ATTORNEY OF RECORD
*Timothy S. McCole*

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____